**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAROL ANN GEORGE,
          *Plaintiff-Appellee*,

v.

DEPUTY JARRETT MORRIS; DEPUTY
JOSEPH SCHMIDT; DEPUTY JEREMY
ROGERS,
          *Defendants-Appellants*.

---

THE COUNTY OF SANTA BARBARA;
DEPUTY HARRY HUDLEY; DEPUTY
LARRY HESS,
          *Defendants*.

No. 11-55956

D.C. No.
2:09-cv-02258-
CBM-AGR

CAROL ANN GEORGE,
          *Plaintiff-Appellant*,

v.

JARRETT MORRIS; JOSEPH SCHMIDT;
JEREMY ROGERS,
          *Defendants-Appellees*,

and

No. 11-56020

D.C. No.
2:09-cv-02258-
CBM-AGR

ORDER AND
AMENDED
OPINION

THE COUNTY OF SANTA BARBARA;
HARRY HUDLEY; LARRY HESS,
                    *Defendants*.

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
February 7, 2013—Pasadena, California

Filed July 30, 2013
Amended September 16, 2013

Before: Diarmuid F. O'Scannlain, Stephen S. Trott,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence and Dissent by Judge Trott

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's summary judgment denying qualified immunity to sheriff's deputies and dismissed plaintiff's cross appeal for lack of jurisdiction in these actions arising from the shooting by the deputies of an armed homeowner on his patio.

The panel held that drawing all reasonable inferences in plaintiff's favor, as it was required to do at this interlocutory stage, the specific circumstances did not indicate that the decedent posed an immediate threat to the safety of the officers or to others. The panel stated that if the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment. Defendants therefore were not entitled to qualified immunity.

The panel dismissed the cross appeal brought by decedent's wife after her counsel conceded at oral argument that the cross appeal had not been well taken.

Judge Trott concurred in small part and dissented in large part. He disagreed with the majority's conclusion that decedent did not pose an immediate threat to the safety of the officers called to the scene by decedent's distraught and terrified wife in a 9-1-1 emergency call, or an immediate

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

threat to the safety of others. Judge Trott agreed with the majority's disposition of the cross appeal.

## COUNSEL

Michael Maury Youngdahl, County of Santa Barbara, CA, argued the cause for the defendants-appellants/cross-appellees. Kelly Duncan Scott, Deputy County Counsel, filed the briefs. With her on the briefs was Dennis A. Marshall, County Counsel.

Stephen K. Dunkle, Sanger Swysen & Dunkle, Santa Barbara, CA, argued the cause and filed the briefs for the plaintiff-appellee/cross-appellant. With him on the briefs were Robert M. Sanger and Catherine J. Swysen, Sanger Swysen & Dunkle, Santa Barbara, CA.

## ORDER

The opinion and dissent filed in this case on July 30, 2013, and reported at — F.3d —, 2013 WL 3889157, are hereby amended. An amended opinion and an amended dissent are filed concurrently with this order.

With these amendments, Judges O'Scannlain and Clifton have voted to deny the petition for rehearing. Judge Trott has voted to grant the petition for rehearing. Judges O'Scannlain and Clifton have voted to deny the petition for rehearing en banc. Judge Trott has recommended granting the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no active judge has

requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are **DENIED**. No subsequent petitions for rehearing and rehearing en banc may be filed.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a reasonable jury could determine that three sheriff's deputies violated the Constitution when they fatally shot an armed homeowner on his patio.

I

A

At half past five, on the morning of March 6, 2009, Carol George awoke. Her husband Donald needed food.[1] Donald had a terminal case of brain cancer and, as a result of his chemotherapy, ate frequently to manage headaches. His wife brought him a snack and then, not having slept well, returned to bed. Shortly after, George took the keys to the couple's truck from the night stand and went downstairs. Concerned

---

[1] We adopt Carol's "version of the facts," as she is the non movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Part II of our opinion explains why we cannot agree with our dissenting colleague that we are at liberty to prefer the deputies' version in this interlocutory appeal.

for his well-being, Carol followed him. She witnessed him retrieve his pistol from the truck and load it with ammunition.

Carol called 911. Because she used her cell phone, the call went to the Ventura California Highway Patrol. On the audio recording in evidence, she can be heard exclaiming "No!" and "My husband has a gun!" The highway patrol dispatcher could only determine that she lived somewhere in Santa Barbara. Her husband wanted her to hang up, so she did. The dispatcher then contacted a Santa Barbara County 911 operator who called Carol back and obtained her complete address.

Deputies were dispatched to the residence for a domestic disturbance involving a firearm. Santa Barbara Sheriff's Deputies Jarrett Morris and Jeremy Rogers responded first. Carol met them at the front door. She asked them to be quiet and not to scare her husband, while also advising that he was on the patio with his gun.

The deputies decided to establish a perimeter around the house. They crossed the driveway toward a gate on the east side of the property. Morris was in the lead, with Schmidt and Rogers following. They carried two AR-15 rifles in addition to their service revolvers. Unable to spot Donald, and concerned that he might use a door on the west side of the house to exit, Rogers turned back to cover that side. Morris tried to assume a position out of sight and Schmidt lay down in ice plants at the bottom of a steep slope near the southeast corner of the house. From his position on the ground, Schmidt could see the back of the house, which had an outdoor balcony on the second floor with a patio.

The district court concluded there was a dispute as to which officer made contact with Donald first. Morris said that Schmidt had—announcing "I see the suspect" on the radio—while Schmidt claimed that it was Morris who initially saw Donald. According to an uncontroverted police-dispatch log, at 8:08 a.m., Donald opened the door to the balcony. Once he appeared in view of the deputies, Schmidt identified himself as law enforcement and instructed Donald to show him his hands. Hearing yelling, Rogers left his post out front and headed into the backyard.

Dispatch was told that Donald had a firearm in his left hand. Morris testified to seeing Donald "carrying [a] silver colored pistol in his left hand, while holding" what he described "as a walker or a buggy."[2] Rogers stated that when George came into view, he was holding a gun with the barrel pointing down. Carol does not dispute that Donald exited onto the balcony with his walker and holding his firearm. However, the district court concluded that Carol's evidence, which included an expert witness's report,[3] called into question whether Donald ever manipulated the gun, or pointed it directly at deputies.[4] Twelve seconds after the

---

[2] A silver Walther pistol was recovered from Donald after the incident.

[3] Although various medical opinions of his were stricken by the district court, Thomas R. Parker (a former FBI agent and California police officer) provided an expert report. It gave perspective on how the deputies' accounts compared with typical police behavior and contained opinions about how the physical layout of the property may have influenced the deputies' and Donald's on-the-scene perceptions.

[4] Morris offers a vivid account of Donald's final moments that we *cannot* credit because the district court found it to be genuinely disputed. *See infra* Part II. According to him, although Donald initially had the

deputies broadcast that Donald had a firearm, the dispatch log records "shots fired." Donald fell to the ground, and Rogers continued to shoot. Together the three deputies fired approximately nine shots. They then ran to assist him, applied first aid, and called an ambulance. Donald died two hours later at the hospital following surgery and admission to the intensive care unit.

## B

Carol sued a year later under 42 U.S.C. § 1983 asserting two constitutional claims.[5] Against Morris, Schmidt, and Rogers she claimed a violation of her late husband's right to be free from excessive force under the Fourth Amendment, as

---

pistol braced against his walker, soon after, Donald reached for what Morris thought was its safety and grasped the gun with both hands. Then in Morris's words:

> [Donald] made the final motion at the rear of the pistol and I said to myself . . . if he raises that gun any higher he's going to be aiming at [Schmidt] and . . . I gotta [sic] take that shot and . . . at that moment as he's raising, he doesn't get higher th[a]n the wall he immediately turns straight east and raises it and is now pointing it directly at me and I had nowhere to go. I'm, I'm crouched down and I'm, I remember seeing the, the black hole actually looking down the barrel as it's pointed right at me and that was when, that was when I fired my first shot.

[5] She also raised a variety of state-law causes of action. Because it is undisputed "that resolution of the federal constitutional claims would necessarily dictate the resolution of the state law claims," we do not address them separately.

incorporated.**[6]**  In a claim chiefly implicating Deputy Harry Hudley, Carol asserted that her own Fourth Amendment right against unreasonable seizure was violated when Hudley kept her from the crime scene in the shooting's aftermath and when she was briefly stopped from visiting Donald in the hospital.  The deputies and their supervisors moved for summary judgment invoking qualified immunity, mainly arguing that neither Donald's nor Carol's constitutional rights had been violated.

After an evidentiary hearing, the district court concluded that based on the admissible evidence, "whether Mr. George presented a threat to the safety of the deputies is a material fact that is genuinely in dispute."**[7]**  This meant a constitutional violation could be proven and the court denied qualified immunity on that basis.  Concluding that the deputies had not argued for its application, the court did not address the second prong of qualified immunity—the clearly established inquiry. That asks whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc).  As to Carol's seizure claim, the district court

---

**[6]** "A claim under 42 U.S.C. § 1983 survives the decedent if the claim accrued before the decedent's death, and if state law authorizes a survival action." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1093 n.2 (9th Cir. 2006) (citing 42 U.S.C. § 1988(a)).  Carol's complaint alleges that she is the personal representative of her husband's estate in full compliance with California law.  She therefore may litigate his Fourth Amendment claim.  *See id.*; Cal. Civ. Proc. Code §§ 377.30, 377.32.

**[7]** Like the dissent, in the context of the district court's preceding analysis, we understand this statement for what it is: a determination that the facts about how Donald and the deputies had behaved prior to the shooting were contested.  *See* Dissent at 33.

decided there was no constitutional violation and, in the alternative, that "the right at issue was not clearly established." It therefore granted summary judgment to Hudley and the other deputies.

Morris, Rogers, and Schmidt timely appeal the denial of summary judgment. Carol timely cross appeals, seeking review of the district court's grant of summary judgment to the deputies on her unreasonable seizure claim.

II

Because Morris, Rogers, and Schmidt challenge the denial of qualified immunity we have jurisdiction over the denial of summary judgment, an interlocutory decision not normally appealable. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). However, the scope of our review over the appeal is circumscribed. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir. 2006). Any decision by the district court "that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009). Stated differently, "we may not consider questions of eviden[tiary] sufficiency, i.e., which facts a party may, or may not, be able to prove at trial." *CarePartners, LLC v. Lashway*, 545 F.3d 867, 875 (9th Cir. 2008) (internal quotation marks omitted).

Noting that we do have authority to consider the materiality of a fact, *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996),—the issue of whether disputed facts "might affect the outcome of the suit under the governing law"—the deputies argue that Carol's disputed facts are ancillary, and therefore immaterial. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). In that respect, they claim that a review of the district court's "reasoning establishes that rather than delineating *actual material disputed* facts, [the court] commingled a group of insignificant discrepancies in statements" in order to conclude that a dispute existed about what had transpired during Donald's final minutes. Although couched in the language of materiality, their argument actually goes to the sufficiency of George's evidence. At bottom, their contention is that Carol could not "prove at trial" that Donald did not turn and point his gun at deputies. *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before a shooting has died, our precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) ("Nowhere in our cases have we held that police misconduct may be proved only through direct evidence.").[8] The district court applied this principle. It parsed the deputies' testimony for inconsistencies, found that medical evidence (and Carol's declaration) called into question whether Donald was physically capable of wielding the gun as deputies described, and found parts of Carol's expert's testimony probative. There were genuine disputes of fact such that a reasonable

---

[8] Other circuits emulate this approach. *See, e.g.*, *Lamont v. New Jersey*, 637 F.3d 177, 181–82 (3d Cir. 2011); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 & n.8 (7th Cir. 2005) (describing the role of a police practices expert and explaining the centrality of inferences "when the plaintiff's sole eyewitness is dead").

jury could "disbelieve the officers' testimony" and rely on record evidence to conclude that Donald had not ignored commands to drop the gun, or taken other threatening measures such as pointing the weapon at deputies.

Because this inquiry, under *Scott v. Henrich* and its progeny, concerns genuineness—namely "the question whether there is enough evidence in the record for a jury to conclude that certain facts are true"—we may not decide at this interlocutory stage if the district court properly performed it. *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc); *see Abdullahi v. City of Madison*, 423 F.3d 763, 772 n.8 (7th Cir. 2005) (discussing the Ninth Circuit's approach). The dissent, however, would have us effectively cast off the interlocutory-review framework. Dissent at 41–46. It tells us we may do so under the banner of *Scott v. Harris*, a case in which not a single Justice of the Supreme Court "discussed the limits of the collateral order doctrine in qualified immunity cases" or even cited the Court's prior authorities on the subject. *Blaylock v. City of Philadelphia*, 504 F.3d 405, 413–14 (3d Cir. 2007) ("[n]either the majority nor the dissent in *Scott* cited *Johnson* or *Behrens*").

In *Johnson*, a unanimous Supreme Court told us these interlocutory appeals involving qualified immunity (1) would be suited to our comparative expertise as appellate judges, centering on "abstract issues of law," as opposed to "the existence, or nonexistence, of a triable issue of fact" and (2) would spare us from pouring over "affidavits, depositions, and other discovery materials." *Johnson*, 515 U.S. at 316–17. If we could exercise the same plenary review as the district judge below, or if we were jurors called upon to weigh the evidence, the arguments of our able colleague in dissent might persuade us. Yet, his scrutinizing of the record cannot

be squared with the *Johnson* paradigm.**⁹**  Even accepting for the sake of argument, though, that *Scott v. Harris* is meant to establish an exception to the rules for interlocutory review, the dissent does not fit within that case's terms either.  It points to no videotape, audio recording, or similarly dispositive evidence that "blatantly contradict[s]" or "utterly discredit[s]" Carol's side of the story.  *Scott*, 550 U.S. at 380.**¹⁰**

---

**⁹** Our conclusion that the *Johnson* principle still applies today is by no means idiosyncratic.  In the years since *Scott v. Harris* (a 2007 decision), we have consistently held that our court lacks the power to reassess facts on interlocutory review.  The 2009 *Eng* decision could not be clearer about what our circuit's law prescribes, *see* Dissent at 43, and there are many other precedents to the same effect.  *See, e.g.*, *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1067–68 (9th Cir. 2012) (explaining that "[u]nder the collateral order doctrine[,] . . . . [w]here there are disputed issues of material fact, our review is limited to whether the defendant would be entitled to qualified immunity as a matter of law"); *Conner v. Heiman*, 672 F.3d 1126, 1130 n.1 (9th Cir. 2012) (explaining that under *Johnson* it is only when the "disputes involve what inferences properly may be drawn from . . . historical facts that are not in dispute" that an interlocutory appeal will lie (alteration in original) (internal quotation marks omitted)); *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) (jurisdiction existed because appellants were "not contesting the district court's conclusion that genuine issues of fact exist for trial" but instead were "appealing the purely legal issue of whether they violated Alston's clearly established federal rights").

**¹⁰** After reciting the summary judgment standard, the *Scott v. Harris* Court explained "[t]here is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question.  There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.  The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals."  550 U.S. at 378.  While the dissent frames a bystander's recollection as that sort of smoking gun, all it might establish is that a

Our decision not to assume *Scott v. Harris* implicitly abrogated a line of precedent also accords with the Supreme Court's later guidance. In a more recent section 1983 case, the Court reaffirmed that "immediate appeal from the denial of summary judgment on a qualified immunity plea is available when the appeal presents a 'purely legal issue.'" *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011); *see also id.* at 893 (explaining that "[c]ases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law" (citing *Behrens* and *Johnson*)).[11]

---

warning was uttered. Dissent at 52. Still crucial (and unknown) is how Donald responded.

Our colleague in dissent also contends that none of the opinions of the police practices expert are admissible. *See* Dissent at 58–59. We will not join issue on this point because the deputies expressly disclaim an evidentiary challenge to Parker's opinions under *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993).

[11] Unlike the dissent we are not convinced that *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) is necessarily to the contrary, for there we confirmed that "[o]ur jurisdiction to review an interlocutory appeal of a denial of qualified immunity . . . is limited exclusively to questions of law." The panel chiefly "looked past the district court's conclusion," Dissent at 43, with respect to the legal significance to be assigned plaintiff's facts. *See, e.g.*, *Wilkinson*, 610 F.3d at 552 ("While perhaps true as far as it goes, [plaintiff's] version omits the urgency of the situation."). Admittedly, though, other parts of the opinion do read as though the appeal arose from the *grant* of summary judgment. *See id.* at 553.

Although *Wilkinson* cited *Scott v. Harris* in service of that approach, its author (Judge Tashima) has taken the position that *Wilkinson* did not "address[] the jurisdictional defect that . . . [fact-related] issues potentially raise under *Johnson*." *Conatser v. N. Las Vegas Police Dep't*, 445 F. App'x 932, 933 (9th Cir. 2011) (per curiam) (a panel including Judge

Thus, in this appeal, we are confined to the question of "whether the defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012).

## III

The deputies' appeal touches on two questions of qualified immunity. First, the deputies claim the shooting did not violate the Constitution. Second, they assert that even if Donald's Fourth Amendment rights were violated, they did not violate law clearly established at the time they acted.

## A

Usually we can start with the second prong of qualified immunity if we think it advantageous. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, though, we are not satisfied that the deputies have adequately pursued that argument. As Carol observes, the district court concluded that the deputies had not "argue[d] that the constitutional right was clearly established at the time of the alleged misconduct." Our review of the record reveals that while they made passing references to this defense, they did not develop it in their briefing below. At an oral hearing on the

_____

Tashima dismissed for lack of appellate jurisdiction officer-defendants' claim that "the evidence cannot support the inference that [the decedent] never attacked them"). We agree that this is the fairest reading of *Wilkinson*. And, because "unstated assumptions on non-litigated issues are not precedential holdings binding future decisions," that case does not dictate how this appeal ought to be resolved. *Proctor v. Vishay Intertech., Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009).

motion for summary judgment, they made absolutely no reference to prong two either. "Although no bright line rule exists to determine whether a matter [has] been properly raised below, an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (internal quotation marks omitted).

We need not definitely decide, however, whether they waived the argument at the district court. On appeal, the deputies have not advanced an argument as to why the law is not clearly established that takes the facts in the light most favorable to Carol. *See Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007) ("The exception to the normal rule prohibiting an appeal before a trial works only if the appellant concedes the facts and seeks judgment on the law."). We will not "do an appellant's work for it, either by manufacturing its legal arguments, or by combing the record on its behalf for factual support." *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012).

Although the deputies' "briefs lapse into disputing [Carol's] version of the facts" as to the threshold constitutional violation as well, we discern enough of a distinct legal claim to entertain that first-prong qualified immunity contention. *Adams*, 473 F.3d at 990.**[12]**

---

**[12]** Our decision on the clearly established issue does not prevent the deputies from appropriately raising the second prong of qualified immunity at a subsequent stage in the litigation, such as in a Rule 50 motion for judgment as a matter of law. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1080–81 (9th Cir. 2009); *Ortiz*, 131 S. Ct. at 889.

B

As to whether the deputies violated the Fourth Amendment, two Supreme Court decisions chart the general terrain. *Graham v. Connor*, 490 U.S. 386 (1989), defines the excessive force inquiry, while *Tennessee v. Garner*, 471 U.S. 1 (1985), offers some guidance tailored to the application of deadly force.

"*Graham* sets out a non-exhaustive list of factors for evaluating [on-the-scene] reasonability: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012). In *Garner*, the Supreme Court considered (1) the immediacy of the threat, (2) whether force was necessary to safeguard officers or the public, and (3) whether officers administered a warning, assuming it was practicable. *See Scott v. Harris*, 550 U.S. 372, 381–82 (2007). Yet, "there are no per se rules in the Fourth Amendment excessive force context." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).[13]

The district court applied the *Graham* factors and found that the first and third unmistakably weighed in Carol's favor. "It is undisputed that Mr. George had not committed a crime,

---

[13] *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (courts must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*") (internal quotation marks omitted), *and Harris*, 550 U.S. at 382 ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").

and that he was not actively resisting arrest or attempting to evade arrest by flight." The deputies do not challenge these conclusions on appeal. They correctly observe, however, that the "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). As to this third key factor, while the deputies certainly aver feeling threatened before they shot George, such a statement "is not enough; there must be objective factors to justify such a concern." *Id.* When an individual points his gun "in the officers' direction," the Constitution undoubtedly entitles the officer to respond with deadly force. *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007). In *Scott*, we likewise recognized that officers firing their weapons at a defendant who "held a 'long gun' and pointed it at them" had not been constitutionally excessive. 39 F.3d at 914.

Taking the facts as we must regard them, that specific circumstance is not present in this case. In *Glenn v. Washington County*, we found that in a 911 scenario without flight or an alleged crime, the officers' decision to shoot an individual holding a pocket knife, "which he did not brandish at anyone," violated the Constitution. 673 F.3d 864, 873–78 (9th Cir. 2011). Reviewing *Long* and *Scott*, we explained that the fact that the "suspect was armed with a deadly weapon" does *not* render the officers' response per se reasonable under the Fourth Amendment. *Id.* at 872–73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. On this interlocutory appeal, though, we can neither credit the deputies' testimony that Donald turned and pointed his gun at them, nor assume that he took other actions that would have been objectively threatening. Given that version of events, a reasonable fact-finder could conclude that the deputies' use of force was constitutionally excessive. Contrary to the dissent's charge, we are clear-eyed about the potentially volatile and dangerous situation these deputies confronted. Yet, we cannot say they assuredly stayed within constitutional bounds without knowing "[w]hat happened at the rear of the George residence during the time Mr. George walked out into the open on his patio and the fatal shot." Dissent at 40. That is, indeed, "the core issue in this case." *Id.*

The deputies argue that the reasonableness of their actions is enhanced because they were told to expect a domestic disturbance. Sitting en banc, this court recently identified this circumstance as a "'specific factor[]' relevant to the totality of the[] circumstances." *Mattos*, 661 F.3d at 450. Domestic violence situations are "particularly dangerous" because "more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* At the same time, we explained in *Mattos* that the legitimate escalation of an officer's "concern[] about his or her safety" is less salient "when the domestic dispute is seemingly over by the time the officers begin their investigation." *Id.* Years before that we had held—in another en banc decision—that a husband's criminal abuse of his spouse "provide[d] little, if any, basis

for the officers' use of physical force" because when law enforcement "arrived [the husband] was standing on his porch alone and separated from his wife." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc). That distinguishing feature from *Smith* and *Mattos* is present here. Carol was unscathed and not in jeopardy when deputies arrived. Donald was not in the vicinity; instead he was said to be on the couple's rear patio.

Today's holding should be unsurprising. If the deputies indeed shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground, then a reasonable jury could determine that they violated the Fourth Amendment. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 227.[14]

---

[14] Carol advances another argument about the unconstitutionality of the shooting which necessarily fails and should be excluded at trial. Specifically, she faults the deputies for (1) not gathering intelligence from her before heading to the backyard, (2) bringing assault rifles, and (3) failing to "set up a non-confrontational, 'soft' perimeter around the house." Although at one time Ninth Circuit law did permit these kind of considerations to inform the subsequent excessive force inquiry, "[w]e have since placed important limitations" on that line of argument. *Billington v. Smith*, 292 F.3d 1177, 1188 (9th Cir. 2002); *see also Espinosa v. City & Cnty. of San. Francisco*, 598 F.3d 528, 547–49 (9th Cir. 2010) (Wu, J., dissenting) (detailing how our law has receded).

In *Billington*, we explained that intervening caselaw, since *Alexander v. City & Cnty. of San Francisco*, 29 F.3d 1355, 1366–67 (9th Cir. 1994), "prevent[s] a plaintiff from avoiding summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." 292 F.3d at 1189. Then, harmonizing *Alexander* "with the Supreme Court's admonition in *Graham*," we explained that a plaintiff cannot "establish a Fourth Amendment violation based merely on bad tactics that

IV

Owing to the obligation to be satisfied of our jurisdiction, we asked the parties to address at oral argument whether Carol's cross appeal had been well taken. Her counsel conceded it had not. In contrast to the situation in which an officer denied immunity finds himself, Carol will not lose any right by having appellate review of her unreasonable seizure claim deferred until final judgment. *See LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester*, 96 F.3d 598, 599 (2d Cir. 1996) (per curiam).[15]

We therefore lack appellate jurisdiction over Carol's cross appeal in its entirety.

---

result in a deadly confrontation that could have been avoided." *Id.* at 1190. At most, Carol's cited failings amount to negligence. Only when "an officer intentionally or recklessly provokes a violent response, and [when] the provocation is an independent constitutional violation" will that conduct color the subsequent excessive force inquiry. *Id.* Moreover, her proposed alternative measures are plagued with the sort of hindsight bias the Supreme Court has forbidden. *See id.* at 1191.

[15] "All circuits that have considered whether the collateral order doctrine confers appellate jurisdiction over appeals arising from a grant of partial summary judgment based on qualified immunity have universally held that such a judgment is not immediately appealable." *Id.* (collecting cases). Pendent appellate jurisdiction might be exercised over non-reviewable interlocutory decisions that raise issues "inextricably intertwined" with matters properly appealed. *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000). But as Carol's counsel rightly appreciated, the claim that deputies unconstitutionally seized Carol involves different facts and legal standards from those germane to whether deputies used excessive force when they shot Donald. *See id.* at 1285.

V

For the foregoing reasons, the cross appeal is **DISMISSED** for lack of jurisdiction. We also conclude that the facts, as we must regard them, show that Santa Barbara Sheriff's Deputies Morris, Rogers and Schmidt could be found to have violated the Fourth Amendment's prohibition on excessive force. They are therefore not entitled to qualified immunity on that basis.

**AFFIRMED IN PART, DISMISSED IN PART.** The parties shall bear their own costs on appeal.

TROTT, Circuit Judge, Concurring in small part and Disagreeing in large part:

Mrs. George has been through a painful set of circumstances, and she deserves not to be subjected to these facts again and again. Nevertheless, with the advice of counsel, she has chosen to sue the deputies who responded to her emergency call, and they, too, are entitled to fair and proper treatment under the law. To render these deputies subject to this misguided lawsuit misapprehends the hazardous situation in which they found themselves, and it devalues case law on the dangers of domestic disputes such as the failed physical attempt by Mrs. George to disarm her angry and dangerous husband.

Moreover, the majority opinion misperceives an important aspect of the doctrine of qualified immunity as explained by the Supreme Court in *Scott v. Harris*, 550 U.S. 372 (2007), an aspect since embraced by the Third, Fourth,

Sixth, Eighth, Tenth, and Eleventh Circuits—not to mention our own. The Court's holding in *Scott v. Harris* and the principle upon which it rests ensures that government officials will not be required to defend themselves in court if it appears to an appellate court from the record taken as a whole that the plaintiff has no case, and therefore as a matter "*of law*," *id.* at 381 n.8 (emphasis added), the lawsuit cannot survive summary judgment. Thus, the majority opinion inadvertently dilutes an essential public interest the doctrine protects: the ability of government officials to perform their responsibilities without paralyzing fear of inappropriate personal lawsuits and potential civil liability.

Let's make one thing clear. The outcome of the rapidly evolving events on March 6, 2008, was not a success. Why? Because Mr. George died, and the best result of interventions like this is to resolve them with no loss of life or other injury. No reasonable law enforcement agency or deputy could disagree with this assessment. On the other hand, fortunately neither the first responders nor anyone else was harmed.

# I

With all respect to my colleagues, I disagree with their and the district court's conclusion that Mr. George did not pose an immediate threat "to the safety of the officers" called to the scene by his distraught and terrified wife in a 9-1-1 emergency call, or an immediate threat to the safety "of others." *Bryan v. Mac Pherson*, 630 F.3d 805, 826 (9th Cir. 2010). This factor is central to this case because, in the calculus of whether or not the force used by police to respond to a hazardous tactical situation was unreasonable and

excessive, it is the "most important." *Id.* We must get this right before we go any further.[1]

## II

I begin with undisputed facts.

This tragic series of events began at 7:44 a.m. on Thursday, March 6, 2008, when Mrs. George, the decedent's wife, placed a 9-1-1 emergency call which was received by the Ventura Branch of the California Highway Patrol ("CHP"). A recording of the call indicates that Mrs. George was hysterically screaming, indeed shrieking almost incomprehensively as loud as any human being could. Repeatedly she is heard amidst the background din of the call yelling, not "exclaiming" but yelling, at the top of her lungs. She says, "No, No, No" and "My husband has a gun!" The 911 operator attempts unsuccessfully to calm her down. A male voice—most certainly her husband's—can be heard in the background saying, "nothing," to which she says "okay." A moment of calm during which she said she was in Santa Barbara is interrupted by more sudden blood curdling screaming and shrieking, "No, No, No, Stop it.", and the phone on Mrs. George's end went dead. This is indisputable *evidence* that a serious domestic dispute was in progress, a heated quarrel between a desperate wife and a defiant husband over a firearm.

The Ventura CHP dispatch operator then immediately called Santa Barbara Sheriff's emergency and advised that dispatch operator of Mrs. George's call. Santa Barbara was

---

[1] I do agree with my colleagues' disposition of Mrs. George's cross appeal.

told that Ventura CHP had received a call from a woman in Santa Barbara "screaming that her husband has a gun." Ventura CHP also advised that the operator was unable to get a complete address. Santa Barbara said, "Okay we'll give her a call."

The following conversation then occurred between the CHP 9-1-1 dispatcher and the Santa Barbara 9-1-1 dispatcher:

> Sheriff' Dispatcher ("S.D."): 9 - 1 - 1 emergency.
>
> CHP Dispatcher ("CHP"):    I had a caller that was a female caller.  The only thing I have is the number [number omitted].
>
> S.D.:   805-[number omitted]
>
> CHP:   [number omitted].  And I got three – the first three of her address is [address omitted], and she says she's in Santa Barbara. She's screaming that her husband has a gun.
>
> S.D.:   Okay, but you don't have an address?
>
> CHP:   No.
>
> S.D.:   And where are you calling from?
>
> CHP:   From Ventura CHP.
>
> S.D.:   Ventura CHP, okay.  I don't know, okay, I guess, was she actually in Santa Barbara City?

CHP:   It's showing off of Cathedral Oaks.

S.D.:   Okay, all right, we'll give her a call.

The Santa Barbara dispatcher operator then called Mrs. George.  Throughout this call, Mrs. George is breathing very heavily and periodically talking to a man in the background, presumably her husband.  She is anything but calm and collected.  The dispatcher described her as sounding "scared."

S.D.:   Hi, this is the Sheriff's Department. Where are you?

Male voice:     It's fine, everything is fine.

S.D.:   Ma'am, where are you?

Mrs. George: I'm   at   home.     He said everything is fine.

S.D.:   What is your address?

Mrs. George:   I gave it to you earlier.

S.D.:   What's  your  address  ma'am,  what's your address?

Mrs. George:   He said everything is fine.

S.D.:   Okay, well, tell me your address.

Male voice:     (unintelligible)

Mrs. George: (Apparently addressing her husband) I'm not talking. (Responding to the dispatcher's question) [street address and name omitted] is my address.

S.D.: [address omitted]?

Mrs. George: Yes. He wants to talk.

At this point, the dispatcher indicated in her deposition that she thought Mr. George had hung up the phone. The dispatcher called back:

Mrs. George: Hello.

S.D.: Hi ma'am, it's the Sheriff's Department.

Mrs. George: Yeah?

S.D.: We have help on the way, can you talk?

Mrs. George: Yes, he's outside right now. He says he won't do anything. He has cancer and he just pulled a gun out. I thought all of them were hidden. He has one, and he says he won't do anything but he just wants to have the – I don't know. If somebody comes, please don't have fire engines.

S.D.: No, we are sending Sheriff's Department out.

Mrs. George:   All right.  I'll talk to someone at the front door.

S.D.:   Ma'am, what is your name?

Mrs. George:   Carol George

S.D.:   Carol George?

Mrs. George:   Yes I've got to go back inside.

S.D.:   If you need anything else, let me know, okay?

Mrs. George:   Thank you.

At 7:51 a.m., Sheriff's deputies were sent to the location, arriving at 7:56 a.m., just 12 minutes after Mrs. George's first 9-1-1 call.  They had been advised by dispatch (1) of a domestic violence incident in progress ("415 D"), (2) that a firearm was involved, (3) that Mr. George had hung up the phone during the 9-1-1 calls, (4) that Mr. George had cancer, (5) that Mr. George was the person with the firearm, and (6) that he had registered firearms in his residence.  This constellation of facts and circumstances amounted to "probable cause to believe that [Mr. George] pose[d] a significant threat of death or serious physical injury to the officers or others."  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  For all the deputies knew, Mrs. George herself was in harms way.

Here, I elaborate on what went on in the George household immediately before the first 9-1-1 call.  These facts come from Mrs. George's own words recorded by the

Sheriff's Department roughly only four hours after the incident, i.e., "Carol's version." Maj. Op. at 5, n.1. After his brain surgery, Mr. George became an angry man.

> [H]e kept on saying I don't want to live like this, I don't want to live like this, I'm going to be a vegetable. He was angry to the point where we locked the guns that were in the house. . . . So there's a closet that has a lock on it . . ., there was one handgun in the bed stand, which I took out, because for a few weeks he could not go up stairs so, I made sure that was locked in the closet as well and I had the key, but we told him Jamie had the key. . . . And so last night, when he went to bed he was furious because he couldn't go to the bathroom. . . . Very, very angry, and he goes I'm not going to live like this. And then this morning I saw that he had gotten this drawer, in the bed stand had a nail through it and so nobody else, that's also where we kept the jewelry and stuff, you know, because nobody could get to it. I noticed it was open. So I got scared and he was very angry and wanted me to leave, he wanted me to leave the house. . . . So finally he went downstairs and I followed him, and he said he wanted me to leave, he wanted me to leave in my car and I knew someplace in the trunk there was a gun hidden, but I had looked for it a couple of days ago and I could not find it, I don't know where it was, and *somehow he got the keys to the car this morning, opened the trunk, pulled out the gun and I am yanking at him and am*

*screaming at the top of my lungs and I started panicking and I called 9-1-1. And he got furious that I called 9-1-1 and he said "if you don't stop it, I will use this gun."* I said "no, just put it down." So finally he says, well lets go in the house. So I walk in the house and he's carrying this loaded gun now. . . . Yeah, I know it was loaded. . . .

(Emphasis added).

When questioned about her knowledge that the gun was loaded, Mrs. George said, "Yeah, he had stuck a pin in it, *I saw him do that*." (Emphasis added). When asked what she meant by "pin," she said, "That clip, something . . . yeah, *I saw him do that because it wasn't loaded in the car*, and I saw him pull it out from a different place and he stuck it in, and I said 'just give it to me, no.' *And I started trying to pull him, pretty strong, I couldn't do it*." (Emphasis added). When Mr. George's gun was recovered, it was loaded with hollow-point bullets.

Parenthetically, Mrs. George's attorney now claims that Mr. George was so impaired by his condition that he was not physically able to point his gun at Deputy Rogers. During oral argument, counsel said, "In particular, Deputy Rogers says that [Mr. George] lifted it up standing with two hands standing and pointing it at him. Mrs. George's statement was that he was physically incapable of doing that at that time. . . . The manner in which he was pointing at the officer being directly contradicted by what his wife . . . ." These factual assertions and claims by counsel are irreconcilable with Mrs. George's detailed description just four hours after the shooting of her husband's behavior that morning. He was

ambulatory, obdurate, "pretty strong" enough to resist his wife's "yanking" attempt to stop him, threatening to use his gun, and dexterous enough to load a clip into an automatic pistol—an action that takes two hands to accomplish. Moreover, she was not a witness to the shooting. Months later, now in litigation, and even though she *saw* her husband load a clip into his firearm on the morning of the shooting, she declares "under penalty of perjury" that he "was unable to stand on his own without holding his walker and hold a gun with both hands in front of him." It will be quite interesting on cross-examination when she is asked to demonstrate for the jury how her husband loaded the clip into his gun. This situation is a close cousin to our "sham affidavit" rule that a "party cannot create an issue of fact by an affidavit contradicting . . . prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). As we said in *Kennedy*, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (alteration & internal quotation marks omitted). After *Scott v. Harris*, this common sense rule takes on added significance.

In addition, we have the testimony of Mr. George's friend, Lawrence Kaehn. Mr. Kaehn, a cancer survivor, and Mr. George frequently discussed Mr. Kaehn's cancer treatment. On one occasion before Mr. George fell ill, he said, "Well, I know what I would do if I came down with cancer. I would get a gun, call the sheriff and have them shoot me." Mr. Kaehn, having considered becoming a sheriff at one time, was "appalled." He said, "It wouldn't be very fair to the sheriff." Mr. George then "gazed off," "stared for

a while," and changed the subject. Unfortunately, "suicide by cop" is a well-documented, terrible phenomenon always present when law enforcement responds to a "man with a gun" call.

On top of all of this, Mrs. George's cry for help was accurately conveyed by the dispatcher to the deputies as one involving armed domestic violence. *That* is what the deputies were told, and, according to Mrs. George's own words, *that* is what it was. I repeat, he had threatened to use the gun and struggled physically with his wife over its possession. These 9-1-1 calls are a textbook case of what local law enforcement confronts when receiving such a 9-1-1 request for help. In this respect, "we must view the facts [from the deputies'] perspective at the time [they] decided to fire." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).

In *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (en banc), in connection with our discussion of the appropriateness of force in that case, we had much to say about what law enforcement faces when it responds to a 9-1-1 domestic dispute call. We did so in consideration of "the additional 'specific factors' relevant to the totality of [the relevant] circumstances." *Id.* at 450 (quoting *Bryan*, 630 F.3d at 826). We said,

> We have observed that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. *Indeed, more officers are*

*killed or injured on domestic violence calls
than on any other type of call.*" *Id.* (internal
quotation marks and citation omitted). We
have also "recognized that the exigencies of
domestic abuse cases present dangers that, in
an appropriate case, may override
considerations of privacy." *United States v.
Black*, 482 F.3d 1035, 1040 (9th Cir. 2007)
(internal quotation marks omitted).

*Mattos*, 661 F.3d at 450 (emphasis added).

### III

Against this grim backdrop, the majority says, as did the
district court, that when he was on the balcony (1) Mr.
George had not committed a crime, (2) he was not actually
resisting arrest or trying to flee, (3) the domestic disturbance
was over, and (4) thus, Mr. George did not pose an immediate
threat to the safety of the officers or to others that would have
justified the use of force. With all respect, to portray this
incident in this fashion is to expose the irrelevance of the
"missing factors" to these events and a misunderstanding of
domestic disputes, especially those involving firearms.[2] If the

---

[2] The Eleventh Circuit in *Harris v. Coweta County*, 433 F.3d 807 (11th
Cir. 2005), made the same analytical mistake in its run-up to the Supreme
Court, focusing not on the facts and circumstances of the case before it,
but on phantom facts and circumstances that were not relevant. I quote
from its opinion. "[T]aking the facts from the non-movant's viewpoint,
Harris remained in control of his vehicle, slowed for turns and
intersections, and typically used his indicators for turns. He did not run
any motorists off the road. . . . Nor was he a threat to pedestrians in the
shopping center parking lot, which was free from pedestrian and vehicular
traffic as the center was closed. Significantly, by the time the parties were

majority opinion's inert view of the events at the George residence is correct, should the officers have simply left the scene? After all, Mr. George had not committed a crime, his wife was supposedly safe, he was not resisting arrest or attempting to flee, and he was entitled by the Second Amendment to have a loaded gun on his own property. This reasoning is illogical, as is George's purported expert's, Thomas Parker, statement in his declaration that the deputies "apparently did not take into account the fact that under California law, it is no crime to keep or carry a firearm in one's own home or on one's property as long as it is not fired and no one is threatened." In elaboration on this irrelevancy, Parker, instead of discussing the actual incident, said,

> In this incident, there was no evidence that Mr. George had broken any laws prior to the arrival of the deputies arrival [sic] on scene, nor that he had threatened anyone. . . . To my knowledge, and from my years of law enforcement experience, I know that there is no state or Federal law in California prohibiting an individual from possessing or carrying a non-fully automatic firearm in their [sic] own house or on their [sic] own property, absent any illegal discharge of same or threat

---

back on the highway and Scott rammed Harris, the motorway had been cleared of motorists and pedestrians allegedly because of police blockades of the nearby intersections." *Id.* at 815–16. The court continued to highlight similar irrelevancies in a footnote, saying, "accepting Harris' version of events, Harris did not attempt to ram, run over, side-swipe, or swerve into any of the officers. . . ." *Id.* at 816 n.11. Not one of these irrelevant observations deterred the Supreme Court from its holding granting immunity to the officers who rammed Harris's car in order to stop him.

to harm an individual.  Neither existed in this case.

Mr. Parker appears in his sanitized version of these events not to be familiar with California Penal Code Section 246.3 which makes it a crime for any person willfully to discharge a firearm in a grossly negligent manner which could result in injury or death to a person.  *People v. Leslie*, 54 Cal. Rptr. 2d 545 (Cal. Ct. App. 1996) describes this crime as a "serious felony."  Section 417 of the Penal Code makes it a crime to draw or to exhibit a firearm in a threatening manner.  Finally, the City of Santa Barbara Municipal Code (S.B.M.C.) makes it unlawful to discharge any firearm of any description in that city.  S.B.M.C. Ch. 9.34.020.  To the extent that the abstract legal landscape of this incident is minimally material, *these* are the laws that applied to Mr. George's actual and intended behavior that morning.

More about Parker and his declarations later.

Mr. George had terminal brain cancer and was clearly suicidal.  He had armed himself with a loaded gun, he was not thinking clearly, he was threatening to use it; and his wife, who had tried unsuccessfully to disarm him, was terrified. She did not call Mr. George's doctor, his pastor, her neighbor, or his friend Mr. Kaehn—she called law enforcement.  She knew what a dangerous situation she had on her hands, as we plainly did in *Mattos*, but we waive it off as not dangerous? Minutes later, a residential neighborhood was the scene of gunfire and a dead body.  *This situation could not be "safe" for anyone until Mr. George no longer had a loaded gun*. Mrs. George certainly understood this, even though Mr. Parker does not.  So do the friends and families of officers killed or injured responding to this category of 9-1-1 calls.

Contrary to my colleagues' view, this dispute was not "seemingly over" when the deputies arrived; and she was clearly still in jeopardy with an armed, suicidal, defiant, and angry husband in the house.

Like the Eleventh Circuit in *Harris v. Coweta County*, my colleagues place undue emphasis on the absence of the circumstances specifically identified in *Graham*, even though we have clearly labeled them non-exhaustive: "These factors, however, are not exclusive.  Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  We must understand this situation for what it was, *not for what it was not*.  A plaintiff's "sanitized version of the incident cannot control on summary judgment when the record as a whole does not support that version." *Wilkinson*, 610 F.3d at 551. I suppose pursuant to the irrelevant and immaterial idea in the abstract that Mr. George's possession of the gun was lawful and that he had not committed a crime, we could say the same about John Hinkley before he shot President Reagan, Jared Loughner before he gunned down United States District Judge John Roll and United States Representative Gabrielle Giffords, Adam Lanza before the Sandy Hook massacre, and James Holmes before the Aurora Colorado slaughter.  Mr. George certainly wasn't in their category, but *armed* people who are combative, furious, angry, and mentally unstable—whatever the reason—are dangerous, period. When we send law enforcement out to cope with them, it is wrong to proclaim that the personnel doing so are not in danger.  And, as the United States Supreme Court said in *Graham*, we must consider that these deputies were responding and reacting to "tense, uncertain, and rapidly

evolving" situation requiring them to make split second decisions involving—in this case—life and death. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Bryan*, 630 F.3d at 818 (Tallman dissenting from denial of reh'g en banc). Mrs. George tried unsuccessfully to disarm her husband. What might have happened had she tried again? Moreover, once Mr. George started firing his weapon outside his home, no telling where the bullets might have gone. I note with some irony that we continue to search nationally for ways to keep firearms out of the hands of mentally unstable persons.

Regrettably, our federal courts have had extensive experience with domestic disputes involving angry and quarreling spouses, and we have written many opinions on this subject—including *Mattos v. Agarano*—on which law enforcement personnel are entitled to rely. Here is an example of what we have said.

1. *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir 2005) (emphasis supplied).

> The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine. When officers respond to a domestic abuse call, they understand that "violence may be lurking and explode with little warning." *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999). *Indeed, "more officers are killed or injured on domestic violence calls than on any other type of call." Hearings before Senate Judiciary Committee*, 1994 WL 530624 (F.D.C.H.) (Sept. 13, 1994)

(statement on behalf of National Task Force
on Domestic Violence).

2.  *United States v. Brooks*, 367 F.3d 1128, 1137 (9th Cir.
2004).

Brooks contends that even if there were
probable cause and exigent circumstances to
justify Perez's warrantless entry, once Perez
heard from Bengis that she was unharmed, the
exigency dissipated and Perez, by staying to
question longer, violated Brooks's Fourth
Amendment rights. . . .

We disagree.  In Perez's experience, as he
testified in the district court, it was "very
common" for victims of domestic abuse
initially to deny that they had been assaulted.
This view could be credited by the district
court.  We, too, agree that a victim of
domestic violence may deny an assault,
especially when an abuser is present.  Perez's
decision to stay and ask more questions was a
reasonable police procedure.  A potential
victim in Bengis's situation with justification
may fear that by complaining to police, he or
she might expose himself or herself to likely
future harm at the hands of a hostile aggressor
who may remain unrestrained by the law.

3. *Tierney v. Davidson*, 133 F.3d 189, 198 (2nd Cir. 1998) (emphasis added).

> Indeed, it may have been a *dereliction of duty* for Davidson to have left the premises without ensuring that any danger had passed. *See Barone*, 330 F.2d at 545. And Davidson could not tell that the danger had passed unless he found the other participant in the dispute. *See State v. Raines*, 55 Wash.App. 459, 778 P.2d 538, 542–43 (1989) ("[T]he fact that the occupants appeared to be unharmed when the officers entered did not guarantee that the disturbance had cooled to the point where their continued safety was assured. Until they had an opportunity to observe [the boyfriend] and talk to him, they had no knowledge of his condition and state of mind.").

4. *Fletcher v. Town of Clinton*, 196 F.3d 41, 50–51 (1st Cir. 1999).

> The balanced choice the officers must make is protected by qualified immunity . . . . Such immunity is given not only for the protection of the officers, but also to protect victims of crime. In the domestic violence context, immunity is given so that officers will not have strong incentives to do nothing when they believe a domestic abuse victim is in danger. Permitting suit against officers who have acted reasonably when there is reason to fear would create exactly the wrong

incentives. Indeed, if the officers had done nothing, and Fletcher had been injured, they would have faced the threat of suit. In either event, their choice would be protected if it was objectively reasonable in light of clearly settled law.

5.  *Fletcher v. Town of Clinton*, 196 F.3d 41, 52 (1st Cir. 1999).

In domestic violence situations, officers may reasonably consider whether the victim is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes. *See United States v. Bartelho*, 71 F.3d 436, 438 (1st Cir. 1995) (noting that officers are often trained not to take the statements of abuse victims at face value, but instead to consider whether the victims are acting out of fear). Indeed, one commentator has estimated that domestic violence victims are uncooperative in eighty to ninety percent of attempted criminal prosecutions against their batterers.

### IV

I turn to what is the core issue in this case: What happened at the rear of the George residence during the time Mr. George walked out into the open on his patio and the fatal shot fired by Deputy Rogers? Did they gun down a sick man who did not even know they were there? Or, did they fire only when he pointed a gun at one of them? *Scott v. Harris* requires that we examine what the *evidence* shows, not

raw speculation and guesswork, but the *evidence*. Has Mrs. George tendered a case sufficient to survive summary judgment or to support a verdict in her favor? Or, does her case fail before trial as a matter of law for want of evidence?

## A.

Before I tackle this question, however, let's put in proper analytical focus the "facts" we must view in the light most favorable to the nonmoving party. Here, notwithstanding my colleagues belief to the contrary, the Supreme Court has told us that we are *not* automatically bound on interlocutory appeal by a district court's statement that a genuine dispute of material facts exists such as to require a trial. In *Scott v. Harris*, the Court said,

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record *taken as a whole* could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

550 U.S. at 380 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (footnote & alteration omitted) (emphasis added).

The Court continued:

> [T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

> summary judgment; the requirement is that
> there be no *genuine* issue of *material* fact.
> When opposing parties tell two different
> stories, one of which is blatantly contradicted
> by the record so that no reasonable jury could
> believe it, a court should not adopt that
> version of the facts for purposes of ruling on
> a motion for summary judgment [on a
> question of qualified immunity].

*Id.* (internal quotation marks & citations omitted) (emphasis in original). In its opinion, the Court once again noted the importance of resolving qualified immunity issues as soon as possible, because "it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 376 n.2 (internal quotation mark omitted). In *Scott v. Harris*, the Court looked at the "record taken as a whole," *id.* at 380, and it overrode the district court's and the Eleventh Circuit's explicit conclusions that a genuine dispute of material facts precluded the denial of summary judgment for the defendant officers. *Id.* at 380–81. The Eleventh Circuit said, "We reject the defendant's argument that Harris' driving must, as a matter of law, be considered sufficiently reckless to give Scott probable cause to believe that he posed a substantial threat of imminent physical harm to motorists and pedestrians. This is a disputed issue to be resolved by a jury." *Harris v. Coweta County*, 433 F.3d at 815. The Court dismissed Justice Stevens's dissenting view that the issue of unreasonable and therefore excessive force was "best reserved for a jury," and that the Court was "usurping the jury's factfinding function." In answer to his concerns, the Court said,

> At the summary judgment stage, . . . once we
> have determined the relevant set of facts and

drawn all inferences in favor of the non-moving party *to the extent supportable by the record*, the reasonableness of [the officer's] actions . . . is a pure question of law.

*Id.* at 381 n.8 (citation omitted) (emphasis in original).

Three years after *Scott v. Harris*, we followed this jurisdictional and legal guidance in *Wilkinson* where we looked past the district court's conclusion that summary judgment was inappropriate because of the perceived existence of "disputed issues of material facts." *Wilkinson*, 610 F.3d at 548.

## B.

Some observations about my colleagues concerns arising from their understanding of *Johnson v. Jones*, 515 U.S. 304 (1995). In this respect, Judge O'Scannlain writes, "Any decision by the district court 'that the parties' evidence presents genuine issues of material fact is *categorically unreviewable* on interlocutory appeal.'" Maj. Op. at p.10 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009)) (emphasis added). This categorical understanding might have been correct before *Scott v. Harris*, but it is no longer.

First, the Court decided *Johnson* in 1995, *Scott v. Harris* in 2007. In deciding *Scott v. Harris*, the Court no doubt was aware of *Johnson*, but my colleagues are correct, it was not mentioned. Thus, I read the two cases not as in conflict, as the Supreme Court surely understood, but plainly compatible. Noting clearly that Jones did offer sufficient information to support a verdict in his favor, 505 U.S. at 307–08, *Johnson* held that we will not on interlocutory appeal revisit that issue,

*id.* at 313. *Scott v. Harris*, on the other hand simply says, *but* if after examining the "record as a whole" it becomes clear *to an appellate court* that the plaintiff has *no* case sufficient to survive Rule 50(c), the unique preemptive purpose of qualified immunity prevails, and the case shall be dismissed now, not later. 550 U.S. at 380. I repeat what the Court said in *Scott v. Harris* about the plaintiff's alleged facts: they must be "supportable by the record." 550 U.S. at 381 n.8 (emphasis omitted). In our case, the complaint's allegations find *no* factual support in the record. Accordingly, as defined by *Scott v. Harris*, the record taken as a whole issue is a *quintessential issue of law*, not just of disputed facts.

I do not stand alone in my understanding of *Scott v. Harris*. To begin with, we have the *Wilkinson* opinion in our own circuit. Furthermore, other circuits have weighed in on this issue. The Third Circuit described *Scott* as marking "the outer limit of the principle of *Johnson v. Jones*—where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review." *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3rd Cir. 2007). The Sixth and Tenth Circuits view *Scott* as an exception to *Johnson*'s jurisdictional limitation. In *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), the Sixth Circuit described *Scott v. Harris* as recognizing "an apparent exception to [*Johnson*'s] jurisdictional limitation when its considered and rejected a district court's denial of summary judgment even though the district court had found genuine issues existed as to material facts." *Id.* at 370. The court then said, "In trying to reconcile *Scott* with the Supreme Court's edict in *Johnson*, this [c]ourt has concluded that where 'the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals

may say so, even on interlocutory appeal.'" *Id.* (quoting *Blaylock, supra*); *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) ("[W]hen the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' we may assess the case based on our own de novo view of which facts a reasonable jury could accept as true." (quoting *Scott*, 550 U.S. at 380)). Both circuits have relied on their understanding of *Scott v. Harris* in thorough, unpublished opinions. *Rodriguez v. City of Cleveland*, 439 F. App'x 433, 456–57 (6th Cir. 2011); *Blackwell v. Strain*, 496 F. App'x 836, 845–47 (10th Cir. 2012). In each case, the circuits granted qualified immunity to the defendants on appeal notwithstanding the district courts' statements regarding the existence of genuine disputes of material fact.

The Fourth, Eighth, and Eleventh Circuits view *Scott* as simply "reinforc[ing] the unremarkable principle that at the summary judgment stage, facts must be viewed in a light most favorable the nonmoving party when there is a *genuine* dispute as to those facts." *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 277 (4th Cir. 2011) (internal quotation marks omitted); *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) ("Although we view the facts and any reasonable inferences in the light most favorable to [the plaintiff], we cannot ignore evidence which clearly contradicts [the plaintiff's] allegations." (citation omitted)); *Morton v. Kirkwood*, 707 F.3d 1276, 1284–85 (11th Cir. 2013) (recognizing that a circuit court may "discard[] a party's account when the account is inherently incredible and could not support reasonable inferences sufficient to create an issue of fact," but holding that the defendants evidence did not completely discredit the plaintiff's version of events (internal quotation marks omitted)).

Furthermore, *Scott v. Harris*'s rule does not apply only to situations where a videotape demolishes a plaintiff's case. Although some of the cases I refer to did benefit from a videotape, *Scott v. Harris* clearly did not create a videotape-specific rule. Instead, it established a *principle* to be applied where it is applicable. The whole record there made that principle applicable *as a matter of law*, as I believe it does here—as a matter of law. The Court referred to the videotape as "an added wrinkle," not as a prerequisite to the application of the articulated principle. 550 U.S. at 378. *Wilkinson* did not rely on a videotape either, but we followed *Scott v. Harris* nevertheless. 610 F.3d at 549–51.

In summary, *Johnson* remains viable, but only where the case involves a genuine issue of material fact, not when it does not.

## C.

I return to the case at hand. Noting that not a single percipient witness contradicts this evidence, I start with Deputy Rogers's description of this event:

> We decided to set up a perimeter around the house to contain the threat of the man with the gun. I took the "1-2" corner of the house which covers the front door and east side of the house, Deputy Schmidt took position in the "2-3" corner of the house, and Deputy Morris covered the "3-4" corner of the house.

> While holding my position I asked Deputy Hudley to determine if there are any exits on the west side of the property. Deputy Hudley

advised that there is a door on the west side, and he agreed to cover that portion of the house.

At approximately 8:11:17 a.m. I heard Deputy Schmidt try to contact me over the radio and then I heard him broadcast that he saw a door opening. At this time I decided to leave my position at the "1-2" corner to assist Deputies Schmidt and Morris. I walked down the northeast corner of the house towards the backyard, and there I saw the suspect with a gun in his hand and pushing a walker or buggy walk out of a door onto a patio. I immediately crouched down behind a tree with no foliage.

At approximately 8:11:51 a.m. I heard Deputy Schmidt broadcast over the radio that the subject (Donald George) was on the back patio with a firearm in his left hand.

I heard Deputy Schmidt shouting commands to the suspect, such as, "Drop the gun," "Show me your hands," and "Sheriff's Department."

I observed the suspect manipulating the rear portion of the gun as if to rack a round or remove the safety while Deputy Schmidt was still shouting commands. The suspect held the gun down towards the yard and began to scan the backyard. I also heard the suspect talking, and what appeared to be in response

to Deputy Schmidt's orders.  He said, "No" a few times and something that sounded like, "No you won't."

The suspect then turned east toward me, raised his gun and pointed it directly at me.  I saw the barrel of his gun pointed at me, and fearing for my safety I fired my weapon at him.

The suspect did not fall down after my first shot and the barrel of his gun was still pointed at me.  Still fearing for my safety I fired my weapon five times until I no longer perceived the threat of serious bodily harm or death.

Deputy Rogers's first-person description of his use of a firearm is corroborated by Deputy Schmidt:

Deputies Morris and Rogers told me that Mrs. George reported her husband was last seen on the back patio with a firearm.  The three of us walked down the driveway and through a side gate that led to the backyard.

We decided to set up a perimeter around the house to contain the threat of the man with the gun. Deputy Rogers took the "1-2" corner of the house which covered the front door and east side of the house, I took position in the "2-3" corner of the house, and Deputy Morris covered the "3-4" corner of the house.

Once I arrived at the "2-3" corner in the backyard I stayed in position, gathering information and broadcasting my observations over the radio. I stayed in this position for approximately seven minutes when at 8:11:17 a.m. I saw the door to the patio open, and then at 8:11:51 a.m. the suspect came out on the patio with a firearm in his left hand. I immediately broadcast this information over the radio.

I saw Deputy Rogers take position to the east of the patio about 10–12 feet from where the suspect stood, and Deputy Morris moved his position closer to my west side.

I began to shout commands to the suspect, such as: "Sheriff's Department," "Show me your hands," and "Drop the gun."

At this time the suspect held the gun down towards the yard, and he appeared to be scanning the backyard looking for the direction of my voice.

I saw the suspect manipulate the gun with his right hand in what appeared to me a move to take off the safety on his gun. I heard the suspect say, "No you won't."

I then saw the suspect lift his gun and point it directly at Deputy Rogers. Fearing for the safety of Deputy Rogers I shot at the suspect.

After firing two shots I saw the suspect fall to the ground. I immediately began to run towards the patio. I heard one more shot. When I got closer to the patio I saw the suspect lying on the ground with his gun lying on the center of his chest.

Next, I turn to Deputy Morris:

Once I arrived at the "3-4" corner in the backyard I stayed in position, gathering information and broadcasting my observations over radio. I stayed in this position for approximately seven minutes until Deputy Schmidt announced (over the radio) at 8:11:51 a.m. that he saw the suspect on the back patio with a firearm in his left hand.

Once I heard Deputy Schmidt's report, I moved closer to the patio to aid Deputy Schmidt. I positioned myself to the west of Deputy Schmidt. From that position I was able to see the suspect with the gun in his hand, and he appeared to be pushing a buggy or a bicycle.

I saw Deputy Rogers take a position to the east of the patio where the suspect stood.

At this time the suspect held the gun down towards the yard, and I heard Deputy Schmidt shouting commands to him, such as, "Drop the gun," "Show me your hands," and "Sheriff's Department." The suspect

appeared to be scanning the backyard looking for the direction of Deputy Schmidt's voice.

I then saw the suspect lift his gun, turn eastward, and point his gun directly at Deputy Rogers. Fearing for the safety of Deputy Rogers I fired at the suspect.

Lawrence Hess was Schmidt's, Rogers's, and Morris's supervisor. He heard the initial dispatch call to the George residence and arrived shortly after his deputies. This is his input:

I arrived at [address omitted] at approximately 8:06:51. I parked my vehicle on San Antonio Creek Road, north of Via Gennita. I walked down Via Gennita and I found Deputy Hudley talking with a woman, Carol George, behind his patrol vehicle. Deputy Hudley told me Mrs. George was the reporting party, that her husband was depressed, recently had brain surgery to remove a tumor, and that she had secured all of the firearms that she could find in the home because of his depression. Mrs. George explained that her husband had been frustrated, angry and argued with her that morning. He produced a handgun and she called 9-1-1 for help.

I used Deputy Hudley's cell phone to call the George's house telephone. Mr. George did not answer but an answering machine activated. I repeatedly called out to Mr.

George over the telephone and into the answering machine to come to the phone in an attempt to open dialogue with him. Mr. George did not answer.

During this attempted phone call I heard one of the deputies in the backyard shouting commands, such as "Drop it" and "Put it down." I next heard several gun shots.

Shortly thereafter I heard radio transmissions advising "Shots fired" and "Suspect down" with medical assistance requested. I quickly walked to the backyard and instructed Deputy Hudley to stay with Mrs. George.

In addition to the deputies' declarations, we have bystander citizen information from Karla MacDuff corroborating their description of the sequence of events and the deputies' warnings before the shooting started. MacDuff was a guest and a friend of the Georges who was living in the lower apartment level of the house. According to MacDuff, she was awakened at approximately 7:45 a.m. that morning by someone excitedly shouting "Drop the gun." She heard this command two times. After these commands, then she heard "quite a few gunshots." There is nothing relevant in the record that challenges her information.

The unchallenged department log of real-time radio broadcasts from the deputies in the field reveal how quickly these events unfolded. At 8:04:22 a.m. (Deputy Schmidt), the log reports " . . . no visual on the subject." At 8:08:04 a.m. (Deputy Morris), "Subj on the second floor to the rear of

residence just opened the door to balcnoy (sic) no vosual (sic)." 8:11:51 a.m. (Deputy Schmidt), "Subj with a firearm in left hand." Twelve seconds later, at 8:12:03 a.m. (Deputy Schmidt), "Shots fired." Thirteen seconds later at 8:12:16 a.m. (Deputy Rogers), "Subj down." These radio broadcasts and this timeline corroborate the deputies' version of the events. The elapsed time from Mr. George's appearance on the balcony to "shots fired" was a mere twelve seconds. Twelve seconds is roughly fifteen normal heartbeats. That is how precipitously this encounter transpired.

Finally, Deputy Rogers's shot that hit Mr. George entered into the front of his body and emerged through the rear. This evidence indicates that Mr. George had turned to face Deputy Rogers—who was stationed to the left side of Mr. George when he walked onto the patio. I note that the photographs in the record are consistent with the deputies' descriptions of their locations at the time of the shooting.

Was Mr. George suicidal? Was he planning that morning to use his gun? Mrs. George thought so. Pam Plesons, her friend and neighbor, recounts this conversation with her on the morning immediately after the shooting:

> A. . . . So as a result of his stroke he was incontinent that night and apparently woke up very depressed, and Carol told me that he asked her to leave the house, and she said that she did not want to leave him alone and she was afraid for him because she thought that he might commit suicide. And she told me that she didn't believe there were any guns in the house, but apparently he had gone to the truck in

the driveway and there was a gun in the glove compartment of the truck, and that he had come back in the house with it.

Q. Okay. Did Carol tell you that she was concerned about Don was suicidal?

A. She told me that one of the doctors they were working with had warned her that he thought he might become suicidal or was suicidal and to make sure that anything that was of danger to him in the house was removed.

Q. Did Carol tell you that she had locked up or she had thought she locked up all the guns?

A. Uh-huh, that's why she didn't think that there was anything that he could get to.

Q. Did Carol tell you why she thought Don asked her to leave that morning?

A. He said that he just wanted to go out and sit on the back patio and enjoy the morning. She said that she felt that he was going to commit suicide.

## V

Against the combined force of this compelling evidence, the district court concluded nevertheless that the defendant's motion must fail. On what did the district court rely? (1) A

textbook example of a self-serving declaration from Mr. George's wife who did not see the shooting, a declaration prepared during litigation which is impeached by her own words, (2) disputed facts that are not material, and (3) a demonstrably flawed report from an ex-FBI Agent full of irrelevant inadmissible speculation.

The fatal problems with Mrs. George's manufactured declaration have been discussed in Part II of this opinion. Thus, let's examine the district court's "disputed facts."

Here the court cited to differences between the deputies' memories as to who "made the decision to set up a perimeter around the house." Remembering that this entire event took only a few minutes and that it was fluid and rapidly evolving, *who* set up the perimeter is utterly immaterial. No one disputes that the deputies set up a perimeter. *Who* gave the order is of no moment. Moreover, the record and the deputies' declarations previously quoted reveal that *two* perimeters were established, the first when Morris and Rogers arrived, and the second when Schmidt arrived, saw Mr. George emerge on the patio, and the deputies then moved and surrounded the rear of the house. I repeat, the perimeter changed when Mr. George appeared on the patio.

The next "disputed fact" seized upon by the district court was who saw Mr. George first and how he was holding the gun. Again, the deputies were not together, and who saw him first and how he was holding the gun is inconsequential. To quote the district court, "Deputy Morris stated that it was Deputy Schmidt who first made contact with Mr. George. However, Deputy Schmidt stated that Deputy Morris was the first one to see Mr. George." Under these kaleidoscopic circumstances, *who* saw Mr. George first is immaterial to the

question of whether the deputies' use of force was reasonable or excessive. So is how he was holding the gun *when he emerged on the patio*. Everyone, everyone agrees he was carrying a loaded gun in his hands.

In summary, these "disputed facts" add nothing to the plaintiff's case. To give them probative weight violates a central principle of summary judgment law: "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Next, we get to whether Mr. George provoked the shooting because instead of dropping his gun as commanded, he pointed it at Deputy Rogers. Here, the district court relied on an opinion, purported to be an expert opinion, offered after the fact by Thomas Parker. Parker says he did not believe Deputy Schmidt could see Mr. George and therefore Deputy Schmidt could not tell whether or not Mr. George had a gun. Again, Mr. George *did* have a gun, and second, it is news to me that a witness can testify as an expert that from point A, he doesn't believe someone can be fully seen from point B. This isn't "expert testimony." And here, it is no more than rank and inadmissible result-oriented speculation. Did Parker simply disregard Karla McDuff's statements that she heard the deputies shouting "drop the gun!"?

Mr. Parker's opinion on the key issue of whether Mr. George pointed his gun in Deputy Roger's direction is no better. Parker's report makes no mention of the violent struggle the Georges had over the gun before the deputies arrived. Parker incompletely describes Mr. George as

handicapped with a right side and arm that were "extremely weak."

Moreover, Parker claims a special ability to read body language and to divine who is "lying" and who is not. He claims by virtue of his education, training, knowledge, and experience that he is aware of a "truism of the law enforcement profession that law enforcement officers lie . . . [in an attempt] to justify inappropriate, unethical, and illegal actions taken by them." Fortunately for all of us, we resolve cases and controversies with evidence, not self-aggrandizing "truisms." His offerings as to whether a witness is telling the truth will not be admissible as expert—or even lay—opinion. His report is rife with rank guesswork.

Parker goes on to opine that Mr. George probably could not have coherently said what the deputies say he said because he had aphasia. Was not Mr. Parker aware of the pre 9-1-1 conversation between husband and wife? Mr. George's voice can be heard clearly on the 9-1-1 call recording, which Parker claims he listened to when preparing his declaration. Or of Mrs. George's description of his responses to her pleas? Now, Parker is a speech pathology expert in aphasia. Undaunted, he goes in to guess that Mr. George "had no idea whatsoever that the deputies were in his yard or issuing commands to him." I assume this is part of the "evidence" the district court struck from the record when the court concluded that Parker was not a qualified "medical expert."

More fundamentally, however, Parker's report—which is a classic example of Monday morning quarterbacking—is of restricted value in this setting. His report suffers most of the problems identified by us in *Reynolds v. County of San Diego*, 84 F.3d 1162 (9th Cir. 1996), *overruled in part on*

*other grounds by Acri v. Varian Assoc., Inc.*, 114 F.3d 999 (9th Cir. 1997) (en banc). There, we said, "The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable. The inquiry is not 'whether another reasonable or more reasonable interpretation of events can be constructed . . . after the fact.' Rather, the issue is whether a reasonable officer could have believed that his conduct was justified." *Id.* at 1170 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). *Id.* We also said, "The fact that [the expert] disagrees with the steps [taken by the deputy] is not enough to *create* a genuine issue of material fact regarding the reasonableness of [the deputy's] conduct." *Id.; see also Tennessee v. Garner*, 471 U.S. at 20 (warning against "inappropriate second-guessing of police officers' split-second decisions").

Parker also paints a naive picture of domestic calm in the George residence when the officers arrived, leaving out why Mrs. George called 9-1-1, focusing instead to the exclusion of everything else in her statements that "everything is fine," and that "he won't do anything." Probably Parker is unaware of our jurisprudence regarding domestic trouble in connection with police intervention. This might be because the F.B.I. where he was employed for most of his career does not respond to local 9-1-1 calls involving this challenging problem, where danger always lurks and where frightened spouses cannot always be expected to give a reliable picture of what had happened to provoke the call.

In summary, Mr. Parker cannot be allowed as an "expert" to surmise or speculate or opine (1) that the deputies are lying, (2) that he doesn't believe Mr. George knew the deputies were in his backyard or that he could hear the deputies commands, (3) that Mr. George could not have

uttered any coherent words in response to the deputies commands, and (4) that Deputy Schmidt could not see a gun in Mr. George's hands when Deputy Schmidt was yelling at him on the patio. What is left of Mr. Parker's report that is relevant or material to the issues of excessive force? Nothing. There is no such thing as an expert on these issues short of medically-trained personnel familiar with Mr. George's senses. Apparently Mr. George was coherent and responsive—if not rational—in his conversations with his wife, but Mr. Parker appears to believe that capacity evaporated when he walked onto his patio.

## VI

Simply put, there is no competent admissible direct or circumstantial evidence in this record to prove or even to suggest under rigorous *Scott v. Henrich*[3] review that Mr. George did not point his gun at Deputy Rogers before he was shot. The disputes cited by the district court are not material, and the remainder of the plaintiff's evidence is demonstrably not competent either to resolve the ultimate issue of excessive force or the deputies' credibility.

What we are inexorably left with is a situation (1) where the deputies had incontrovertible cause to believe Mr. George posed "a threat of serious physical harm, either to the officer[s] or to others," (2) where he had threatened them with a weapon, and (3) where he had been given a warning to drop the gun. *Tennessee v. Garner*, 471 U.S. at 11–12.

---

[3] *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002).

These are life and death encounters. Focusing on inconsequential details out of context distorts the totality of the facts and leads one to errant conclusions. No reasonable factfinder could conclude on this record that the disputed use of force was unreasonable or excessive. A jury verdict in favor of the plaintiff could not survive Rule 50(a). The plaintiff's theory that the deputies simply gunned down a harmless man is nothing more than groundless conjecture. The plaintiff's evidence in this case examined "as a whole" is no better than the plaintiff's evidence in *Scott v. Harris* or in *Wilkinson v. Torres*. Her case is not "supportable by the record." *Scott v. Harris*, 550 U.S. at 381 n.8 (emphasis omitted); *Anderson*, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.") This is not just a case where something like a videotape demolishes the plaintiff's factual allegations, it is a situation where the plaintiff has no case at all, because, among other deficiencies, her own words spoken just four hours after the shooting undercut what her lawsuit now claims. Her statement in the main was the compelling evidentiary equivalent of the videotape in *Scott v. Harris*. *Coble v. City of White House, Tenn.*, 634 F.3d 865, 869 (6th Cir. 2011) ("The *Scott* opinion does not focus on the characteristics of a videotape, but on 'the record.'").

## VII

Why does all of this matter? It matters because the doctrine of qualified immunity requires the judiciary to refrain from inappropriately intruding into and interfering with the assigned responsibilities of the executive branch of government. The Supreme Court has repeatedly stressed this concern and determined it to be so substantial that qualified

immunity is not just a "mere defense to liability," but an "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Fleshing out this defense, the Court has called it "an entitlement not to stand trial or face the other burdens of litigation . . . ." *Id.* Moreover, the Court also emphasized that the immunity "is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526–27. It is for this reason that a district court's denial of qualified immunity is *immediately* appealable. *Id.* This reasoning distinguishes denials of normal interlocutory decisions which are not immediately appealable, and this interlocutory decision which is.

The Supreme Court's rationale for this doctrine finds it roots in the Court's recognition that a rule to the contrary would have significant and undesirable costs "to society as a whole." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

> These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties."

*Id.* (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2nd Cir. 1949)) (brackets in original).

This doctrine is not of recent vintage. In an article cited in a footnote by the Court in *Harlow*, 457 U.S. at 814 n.22, we discover that

> the Lord Mayor of London, in 1666, when
> that city was on fire, would not give directions
> for, or consent to, the pulling down 40
> wooden houses, or to removing the furniture,
> &c, belong to the Lawyers of Temple, then on
> the Circuit, for fear he should be answerable
> for tresspass; and in consequence of this
> conduct half that great city was burnt.

Peter H. Schuck, *Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages*, 1980 S. Ct. Rev. 281 (quoting *Respublica v. Sparhawk*, 1 DALL. 357, 363 (PA. Sup. Ct. 1788)). *Scott v. Harris* follows inexorably from the preemptive purpose of the doctrine and wisely calibrates *Johnson v. Jones* accordingly.

Thus, we must remand with instructions to grant the motion for summary judgment based on qualified immunity and enter judgment for the defendants. Mr. Kaehn had it right: To do otherwise is not fair to the sheriffs.