**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JASON FUHR, individually, and as Executor of estate of Shaun Fuhr; DAVONTA TANIYA FUHR, | No. 24-5618 |
| | D.C. No. 2:23-cv-00600-BJR |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| CITY OF SEATTLE; NOAH ZECH, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted November 19, 2025
Seattle, Washington

Filed May 7, 2026

Before: M. Margaret McKeown, William A. Fletcher, and
Roopali H. Desai, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge W. Fletcher

# SUMMARY[*]

## Qualified Immunity

The panel affirmed the district court's summary judgment in favor of Noah Zech, a Seattle Police Department officer, in a 42 U.S.C. § 1983 action alleging that Zech used excessive force when he shot and killed Shaun Fuhr, who was fleeing police while holding his infant daughter.

Fuhr threatened the mother of his infant daughter, fired his handgun in a public park, and then grabbed his daughter and fled on foot. He dodged authorities for over thirty minutes, and the search grew to encompass a helicopter and Special Weapons and Tactics ("SWAT") officers, including Zech. Despite warnings to stop, Fuhr continued to evade the officers while holding the child. Eventually, Zech and another SWAT officer encountered Fuhr in a residential alley. As Fuhr appeared from behind a bush and proceeded toward the officers with the baby in his arms, Zech fired, killing Fuhr.

The panel agreed with the district court's dismissal of the excessive force claim on qualified immunity grounds. The panel did not decide whether, viewing the facts in the light most favorable to Fuhr, a Fourth Amendment violation occurred. Instead, the panel held only that Zech's conduct did not violate clearly established law. Fuhr's continued possession of the baby after firing a gun, fleeing from law enforcement, and ignoring commands to stop are factors that, when combined, distinguish this case from clearly

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

established law that sets out a constitutional violation. Because no case clearly established a Fourth Amendment right violated by Zech, he was entitled to qualified immunity.

The panel further held that plaintiffs' remaining claims failed.

Dissenting, Judge W. Fletcher wrote that the undisputed facts make clear that Fuhr was shot in violation of clearly established law where he presented no immediate threat to either the officers or his daughter at the time of the shooting. He was walking slowly, holding his daughter tightly against his chest, and could not have used a firearm to harm the officers even if he had one. Moreover, Fuhr was never warned that deadly force would be used, and the officer who yelled for him to stop testified that he was not given adequate time to comply before being killed.

## COUNSEL

Jesse Valdez (argued), James Bible Jr., and Errin Loyal, James Bible Law Group, Bellevue, Washington, for Plaintiffs-Appellants.

Rebecca S. Widen (argued), Catherine E. Riedo, Carson W. Canonie, and Alexandra Nica, Assistant City Attorneys; Ann Davidson, Seattle City Attorney; Seattle City Attorney's Office, Seattle, Washington; for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

Noah Zech, a Seattle Police Department officer, shot and killed Shaun Fuhr with a single bullet. The scene arose out of chaos generated by Fuhr's dangerous actions and flight from police. After threatening the mother of his infant daughter and firing his handgun in a public park, Fuhr grabbed the baby and fled on foot. For over thirty minutes, Fuhr dodged authorities, with the search swelling to encompass a helicopter and Special Weapons and Tactics ("SWAT") officers, including Zech. Despite warnings to stop, Fuhr continued to evade the officers whilst haphazardly dangling the baby. Eventually, Zech and another SWAT officer encountered Fuhr in a residential alley. As Fuhr appeared from behind a bush and proceeded toward the officers with the baby in his arms, Zech fired.

We affirm the district court's grant of qualified immunity because Zech's actions within the unique facts of this case were not so beyond the bounds of permissible as "to make it obvious to all reasonable government actors, in [Zech's] place, that what he [was] doing violate[d]" a clearly established right. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

## Background

At 2:13 PM on April 29, 2020, the mother of Fuhr's one-year-old daughter (referred to here as "AT" to protect her privacy and that of the child) called 911 from a public playfield in south Seattle. AT told dispatch that the father of her child—against whom she had a no-contact order and who had beaten her up the day before—was in the park and

had just fired a gun.  She had run away in fear, and he had left the park with their one-year-old daughter.  AT was frantic and begged the dispatcher for help:

> **Dispatcher:**  Did he have any weapons?
>
> **AT:**  He has a gun.  I know he has it, he just shot it in the park, my ear is ringing.  He just shot it in Skyway, today, he shot it in Skyway.
>
> **Dispatcher:**  Ok, ok, we have a call in—
>
> **AT:**  Please help!  Please not fast enough, please not fast enough, please.  My baby—
>
> **Dispatcher:**  What's his name?
>
> **AT:**  His name is Shaun Fuhr.  We already have a no-contact order, please, I want my daughter, please!  She's only one.  Please, I'm scared for her!

Two minutes earlier, a witness had called to report a man and woman arguing.  According to the caller, a Black male had pulled out a gun, told the woman to run, and then taken the child.  The caller said the man had placed the handgun in the back of his pants and left the area.

Seattle Police Department officers arrived at the park by 2:17 PM.  AT was upset and had visible bruises.  An officer radioed to dispatch that Fuhr had fired a gun and that he had located a shell casing.  The officer further informed dispatch that Fuhr was "incredibly intoxicated" and had the child with him, and that the child's mother "believe[d] the child [was] in grave danger."  AT emphasized to the officer that her daughter was "in danger, like danger."

Various police units responded, including a helicopter, canine tracking unit, and SWAT team. Among the SWAT officers was Officer Noah Zech, who integrated with the canine tracking team's search. Dispatch advised that someone was breaking into a nearby building that was under construction. Zech twice spotted Fuhr fleeing. During the second sighting, Zech observed that Fuhr was "carrying a small baby on his right side down near his hip," gripping the child's torso. He recalled that the infant's "head and arms [were] flopping around pretty violently." When the search team spotted Fuhr, multiple officers repeatedly yelled at him to stop, but he continued to flee and disappeared from view.

The pursuit ended seconds later, at 2:49 PM, when Zech and another SWAT officer encountered Fuhr in an alley beside a multi-story townhome. As captured on bodycam, as Zech and the other officer ran into the alleyway, Fuhr emerged from behind bushes and advanced down a slope towards them. There was a wooden fence of varying height to one side and behind Fuhr, and the officers did not know what lay beyond the bushes from where Fuhr had emerged. Fuhr held his daughter in front of his chest. Less than two seconds after entering the alley and encountering Fuhr, Zech fired a single round, which struck Fuhr in the face.

Zech testified in his deposition that, when he fired, he believed Fuhr was still armed, although he did not see the weapon. Zech recalled knowing Fuhr "was now cornered" but "believ[ing] that [Fuhr] was using this child as a hostage to gain whatever it was he was after that day." In Zech's view, Fuhr presented a grave and immediate threat to the life of the baby, who was at risk as a human shield, bargaining chip, or shooting victim. As a SWAT officer, Zech was trained to intervene when given a window of opportunity and saw the baby's life and safety as his priority. To protect the

baby, Zech's target was Fuhr's forehead, a precision shot that Zech was trained to make. When Fuhr fell to the ground, officers retrieved the baby, who was uninjured. Although Fuhr did not have a firearm on him when he was shot, the gun was recovered in the vicinity.

Fuhr's estate sued Zech and the Seattle Police Department on multiple grounds.[1] The district court granted Zech's summary judgment motion in full.

## Analysis

Reviewing de novo both the district court's qualified immunity decision and its grant of summary judgment, *Vazquez v. County of Kern*, 949 F.3d 1153, 1159 (9th Cir. 2020), we affirm.

### I. Qualified Immunity

We agree with the district court's dismissal of the excessive force claim on qualified immunity grounds. Our qualified immunity inquiry has two prongs, which can be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Under the first prong, the court must consider whether the facts demonstrate violation of a constitutional right. *Id*. at 232. The second prong asks whether that right was "clearly established" at the time of Zech's conduct. *Id.*

We do not decide whether, viewing the facts in the light most favorable to Fuhr, a Fourth Amendment violation occurred. Instead, we hold only that Fuhr's conduct did not violate clearly established law. *See Kisela v. Hughes*, 584

---

[1] We refer collectively to the plaintiffs as "Fuhr" and the defendants as "Zech."

U.S. 100, 103–04 (2018) (per curiam).  Fuhr's claim under 42 U.S.C. § 1983 thus fails.

In undertaking a qualified immunity analysis, we must grapple with the level of generality that defines the claimed constitutional right.  The Supreme Court has emphasized that a clearly established right "should not be defined 'at a high level of generality'" and must be "'particularized' to the facts of the case."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (first quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); and then quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Most recently the Supreme Court reiterated that, in defining a clearly established right, "[p]rinciples stated generally, such as that 'an officer may not use unreasonable and excessive force' do not suffice."  *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam) (quoting *Kisela*, 584 U.S. at 105).  In order "[t]o find that a right is clearly established," we must "'identify a case where an officer acting under similar circumstances was held to have violated' the Constitution."  *Id.* (citation modified) (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)).

Accordingly, we look for precedent that encompasses a noncompliant, fleeing, potentially armed suspect holding a child or potential hostage, and we find none.  Fuhr's continued possession of the baby after firing a gun, fleeing from law enforcement, and ignoring commands to stop are factors that, when combined, distinguish this case from clearly established law that sets out a constitutional violation.

Fuhr urges us to draw upon *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997).  But the rule pronounced in *Harris* that "officers may not shoot to kill" includes an exception for

when "the suspect presents an immediate threat to the officer or others." *Id.* at 1201. Indeed, "[t]he 'most important' factor" in the excessive force context "is whether the suspect posed an 'immediate threat'" to officers or third parties. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)).

In *Harris*, officers were instructed to shoot any armed suspects on sight, without evaluating whether they posed harm to others, and they did so without a warning to the suspect. 126 F.3d at 1202–04. Here, not only do we have an immediate threat to the baby, but we also have a suspect who ignored warnings. That Zech did not give a final warning does not bring this case within the ambit of *Harris*. Additionally, there are no allegations regarding a shoot-on-sight or similarly unconstitutional policy in this case. Viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396 (1989), it was reasonable for Zech to believe that Fuhr posed an immediate threat to his baby daughter based on his threatening of AT, firing of his gun, lack of compliance with repeated warnings, and prolonged flight throughout which he endangered his child.

The other case relied upon by Fuhr, *George v. Morris*, stresses that the Fourth Amendment does not always require officers to hold their fire until a suspect points his weapon at them or others. 736 F.3d 829, 838 (9th Cir. 2013); *see also Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 917–18 (9th Cir. 2024) (highlighting that *George* does not stand for the proposition that a subject must threateningly wield a weapon to pose an immediate threat). And the circumstances in *George* could not be more different from

our case—George was a sixty-four-year-old man with terminal cancer whose wife called 911 because she had seen him load a pistol with ammunition. 736 F.3d at 832, 839. When law enforcement arrived, George was on the balcony with a walker, and his gun was aimed at the ground. *Id.* at 832–33. He had committed no crime, engaged in no flight, and posed no immediate threat to officers or others. *Id.* at 838.

In *George*, we clearly established that it is a constitutional violation to use deadly force on an armed person when that person did not "objectively threaten[]" law enforcement officers or others. 736 F.3d at 838. But that right is not at issue in this case. Unlike in *George*, where the husband had not taken any "objective[ly] provocati[ve]" actions, *id.* at 839, Fuhr had posed a threat to others throughout the thirty-eight-minute saga, beginning in the park, where he fired a gun near AT and the baby, and continuing until Zech shot him. Zech did not know that Fuhr no longer possessed the firearm, and thirteen seconds before the shooting, several officers encountered Fuhr and ordered him to stop, a command he ignored. Throughout the pursuit, Fuhr showed no intentions of complying with multiple orders, and he continued carrying the baby with little apparent regard for her safety. Confronted with this situation and Fuhr's sudden appearance coming toward the officers, Zech made a split-second decision to fire. These facts place this case about as far as possible from *George*, and we are aware of no case clearly establishing a suspect's right to be free of excessive force in the face of these facts and when his

actions are "objectively threatening" to others.[2]  736 F.3d at 838.

Because no case clearly established a Fourth Amendment right violated by Zech, he is entitled to qualified immunity.

## II. Other Claims

Fuhr's other claims also fail.  To begin, Fuhr does not directly challenge the dismissal of his stand-alone Fourth Amendment claim (Claim I), wrongful death and survival claim (Claim III), and claim under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) (Claim VIII).  Regarding the negligence claim (Claim II), we agree with the district court that the complaint's allegations as well as Fuhr's summary judgment opposition were impermissibly conclusory as to breach and causation.  Fuhr's claim under the Washington Law Against Discrimination (Claim VI) fails for lack of any evidentiary support.[3]  The outrage claim (Claim V) fails because it depends on the Section 1983

---

[2] At oral argument, Fuhr also cited to *Estate of Aguirre v. County of Riverside*, 131 F.4th 702 (9th Cir. 2025).  The opinion in *Aguirre*, however, was not published until five years after the shooting at issue occurred, and thus could not have put Zech on notice that his actions would violate Fuhr's rights.  Apart from the timing issue, *Aguirre*'s immediate threat analysis is inapposite here because it recognized a clearly established right in a situation in which the threat posed "was certainly no greater than that posed by the suspect with a gun in [*George*]." *Id.* at 709.

[3] Fuhr argues for the first time on appeal that implicit bias supports revival of Claim VI under the Washington Law Against Discrimination.  But this argument was not raised in the district court, and we see no reason to make an exception to our general rule barring parties from raising an argument for the first time on appeal.  *See Momox-Caselis v. Donohue*, 987 F.3d 835, 841–42 (9th Cir. 2021).

claim.  Finally, the respondeat superior and indemnification claim (Claim IV) must be dismissed because all other claims fail.

**AFFIRMED**

---

W. FLETCHER Dissent

Shaun Fuhr, a 24-year-old Black man, was shot and killed by a Seattle police officer while holding his infant daughter in his arms.  My colleagues conclude that Fuhr posed such a danger to his daughter when the officer shot him that the officer is protected from suit by qualified immunity.  My colleagues describe in detail the events that preceded the shooting, but provide only an abbreviated account of the shooting itself.  The lead-up to the shooting, and the shooting itself, were clearly captured on several video cameras worn by the officers.

Thirteen or fourteen seconds before the shooting, officers standing at the edge of a residential sidewalk saw Fuhr on the other side of a low-rise apartment building, moving toward their right and disappearing from view behind another building.  They yelled at him to stop.  The officers ran to their right, entering an area between that building and a wooden fence.  Fuhr emerged onto a narrow, gently sloping path ahead of them, walking slowly down the path toward the officers.  Fuhr was surrounded on all sides.  On his immediate left and behind him was a high wooden fence.  On his immediate right was a rockery with plantings.  Fuhr was holding his daughter tightly against his chest.  Both of his hands were clearly visible.  His right hand held his daughter's back from beneath.  His left hand held his

daughter's right leg, reaching over her leg from above. The video clearly shows that neither hand held a weapon.

Fuhr was about fifteen feet away from the officers. One of the officers yelled, "You better stop right now." While that officer was speaking and before Fuhr had a chance to comply, Officer Zech shot Fuhr in the head. About two seconds had passed since Fuhr had come into view. He had taken only three steps down the path. Fuhr slumped to the ground, releasing his baby daughter, unharmed, as he did so. The officer who yelled for Fuhr to stop testified in a sworn deposition that Fuhr had not been given adequate time to comply before being killed.

When he was shot, Fuhr posed no immediate threat to the officers. Though the officers did not know it at the time, Fuhr did not have a firearm. When he emerged on the narrow path carrying his daughter, Officer Zech already had his assault rifle at his shoulder, trained on the path. If Fuhr had had a firearm and had tried to use it, he would have had to release his daughter with one of his hands, reach for the firearm, pull it out, and aim it at the officers. If Fuhr had taken any of these steps, Officer Zech, whose rifle was already pointed at Fuhr, would have had ample time to respond. But Fuhr took none of those steps. Officer Zech acknowledged under oath in his deposition that both of Fuhr's hands were visible in the footage taken by his own body camera. A reasonable fact finder could conclude not only that Fuhr posed no immediate threat to the officers, but also that he was giving up and attempting to surrender as he walked slowly toward them.

Fuhr also posed no immediate threat to his daughter. He had been carrying her for approximately forty minutes. When he was shot, Fuhr was holding her close to his chest

and walking slowly toward the officers.  Officer Zech testified in his deposition that when he shot Fuhr, "I knew that he was now cornered, and I believed that he was using this child as a hostage to gain whatever it was he was after that day."  There is no evidence to support Officer Zech's belief that Fuhr was holding his daughter as a "hostage."  A hostage is a person taken and held to extract a ransom in return for the person's release.  Fuhr had taken his daughter and had sought to escape with her.  He sought no ransom.  To use Officer Zech's words, "whatever [Fuhr] was after that day" was not a ransom but rather his own daughter.

Even if Fuhr had been holding his daughter as a hostage (which, to be clear, he was not), that would not have justified his killing.  A hostage taker has a strong interest in keeping his hostage alive and well, in order successfully to extract a ransom.  If (counterfactually) Fuhr had been holding his daughter as a hostage, there is nothing in the record to suggest that she was in imminent danger because she was a hostage.

Twenty-nine years ago in *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997), we held, "Certain principles are clearly established"—among them, that "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others." We reaffirmed in *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014), that "deadly force is not justified" where "the suspect no longer poses an immediate threat to the police or the public." *See also Calonge v. City of San Jose*, 104 F.4th 39, 46 (9th Cir. 2024) (quoting *Harris*, 126 F.3d at 1204).  We have moreover held it "clearly established" that "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d at 1201 (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12

(1985)); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (quoting *Harris*, 126 F.3d at 1201). With respect to such clearly established rights, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The undisputed facts make clear that when he was shot Fuhr presented no immediate threat to either the officers or his daughter. To use Officer Zech's words, he was "cornered" and could not escape. Even if he had had a firearm, he could not have used it to harm the officers. He was walking slowly, holding his daughter tightly against his chest. He was never warned that deadly force would be used, and the officer who yelled for him to stop testified that he was not given adequate time to comply before being killed.

I respectfully but strongly dissent.